UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

HARVEY DONLEY,
     Petitioner,

vs.                                   Case No.:  4:20cv56/WS/EMT

MARK INCH,
     Respondent.
_____/

## <u>REPORT AND RECOMMENDATION</u>

This cause is before the court on Petitioner Harvey Donley's (Donley) habeas petition, supporting memorandum, and affidavit filed under 28 U.S.C. § 2254 (ECF No. 1).  Respondent (the State) filed a motion to dismiss the petition as untimely, with relevant portions of the state court record (ECF No. 8).  Donley responded in opposition to the motion to dismiss (ECF No. 10).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of the timeliness issue, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the opinion of the undersigned that the pleadings and attachments before the court show that the

State's motion to dismiss should be granted, and the habeas petition dismissed as untimely.

I.    BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 8).  Donley was charged in the Circuit Court for Leon County, Florida, Case No. 2011-CF-544, with one count of trafficking in oxycodone (Ex. A (information)).  The offense conduct occurred on February 17, 2011 (*see id.*).  On May 24, 2012, a jury convicted Donley as charged (Ex. B (trial transcript)).  The trial court sentenced Donley to a mandatory minimum term of twenty-five years in prison (Ex. C (sentencing transcript)).[1]   Donley appealed the judgment to the Florida First District Court of Appeal (First DCA), Case No. 1D13-0404 (Ex. D (initial brief)).  The First DCA affirmed the judgment per curiam without written opinion on January 24, 2014 (Ex. G (opinion)).  *Donley v. State*, 130 So. 3d 230 (Fla. 1st DCA 2014) (Table).  The mandate issued February 11, 2014 (Ex. G (mandate)).

---

[1] Citations to the state court record refer to the exhibits submitted with the State's motion to dismiss (ECF No. 8).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

Case No.:  4:20cv56/WS/EMT

For purposes of the one-year federal limitations period, *see* 28 U.S.C. § 2244(d)(1), Donley's judgment became final on April 25, 2014, upon expiration of the 90-day period in which a defendant may seek direct review of his conviction in the United States Supreme Court.[2] *See Chavers v. Sec'y, Fla. Dep't of Corr.*, 468 F.3d 1273, 1275 (11th Cir. 2006). The federal limitations period commenced the next day on April 26, 2014. *See* Fed. R. Civ. P. 6(a) ("In computing any period of time prescribed or allowed by . . . any applicable statute, the day of the act, event or default from which the designated period of time begins to run shall not be included."); *see also Washington v. United States*, 243 F.3d 1299, 1301 (11th Cir. 2001) (Rule 6 applies to calculation of one-year statute of limitations under AEDPA).

The federal limitations period ran untolled for **354 days** until April 15, 2015, when Donley filed a counseled motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. H at 3–31 (motion)). The Rule 3.850 proceeding reached final disposition on July 27,

---

[2] Donley's 90-day period for seeking certiorari review in the United States Supreme Court was triggered by the First DCA's affirmance in the direct appeal, on January 24, 2014, and it expired 90 days later, on April 25, 2014. *See Chavers*, 468 F.3d at 1265 (entry of judgment, and not issuance of the mandate, is the event that starts the running of time for seeking Supreme Court review).

2017, upon issuance of the First DCA's mandate in the post-conviction appeal (*see* Ex. K).  *See Nyland v. Moore*, 216 F.3d 1264, 1267 (11th Cir. 2000) (a post-conviction petition submitted to a Florida court remains pending until the mandate issues).  The federal limitations period resumed the next day, on July 28, 2017 (Ex. K (mandate)).  It expired **11 days** later, on August 8, 2017.

Donley commenced this federal habeas case on January 30, 2020 (ECF No. 1 at 1, 20).  He presents the following claim:

> **Ground One:  "Trial counsel rendered ineffective assistance by failing to conduct basic research resulting in omission of a critical complete defense to the crime of trafficking in oxycodone by possession, where counsel was fully aware that Petitioner had possession of the oxycodone through a valid legal prescription, but affirmatively misadvised that the prescription defense would not apply because the quantity of confiscated pills was too great. Counsel's misadvisement [sic] resulted in a conviction for a crime in which the Petitioner is actually innocent (i.e. a miscarriage of justice has occurred in this case)."**

(ECF No. 1 at 10–15) (internal quotation marks omitted).

## II.    DISCUSSION

Donley concedes that his § 2254 petition is untimely (*see* Supporting Memorandum, ECF No. 1 at 22, 27).[3]  He argues he is entitled to federal review of

---

[3]  Citations to the parties' filings are to the page numbers automatically assigned by the court's electronic filing system, rather than the page numbers of the original documents.

his constitutional claim through the "actual-innocence gateway" (Supporting Memorandum, ECF No. 1; Response to Respondent's Motion to Dismiss, ECF No. 10). Donley premises his "actual innocence" claim on newly presented evidence that he had a valid affirmative defense to the trafficking charge, i.e., he could legally possess the oxycodone pills seized by law enforcement, because he had obtained them pursuant to valid prescriptions.

Under the AEDPA, a "credible showing of actual innocence" provides a "gateway" through which a petitioner may pursue his claims on the merits notwithstanding his failure to file his habeas petition within the statute's otherwise applicable limitations period. *McQuiggin v. Perkins*, 566 U.S. 383, 386 (2013). To pass through this gateway, however, a petitioner must satisfy the standard for actual innocence articulated by the Supreme Court in *Schlup v. Delo*, 513 U.S. 298 (1995). Under *Schlup*, a petitioner must show that, in light of newly presented evidence, "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt," *id.* at 327, or, to remove the double negative, "that more likely than not any reasonable juror would have reasonable doubt," *House v. Bell,* 547 U.S. 518, 538 (2006).

*Schlup* makes clear that, "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." 513 U.S. at 324. This new evidence must do more than counterbalance the evidence that sustained the petitioner's conviction. *See Sibley v. Culliver*, 377 F.3d 1196, 1207 (11th Cir. 2004) (concluding that even if new evidence showed that the murder victim was the aggressor, "a reasonable juror could still quite possibly have concluded that [petitioner] acted with murderous intent, rather than out of self-defense"). The new evidence must be so significant and reliable that, considered with the trial record as a whole, it "undermine[s] confidence in the result of the trial." *Schlup*, 513 U.S. at 327 (internal quotation marks omitted).

Neither the Eleventh Circuit nor the Supreme Court has decided whether an affirmative defense, if proven, amounts to proof of actual innocence and thus a basis for passing through the gateway the AEDPA leaves open to late filers. *See Rozzelle v. Sec'y, Fla. Dep't of Corr*, 672 F.3d 1000, 1013–15 (11th Cir. 2012) (citing cases in other circuits going both ways). Assuming, without deciding, that evidence is "new," for purposes of *Schlup*, if it is simply newly presented, as opposed to newly

discovered, and further assuming that evidence of an affirmative defense amounts to proof of actual innocence, Donley has not shown it is more likely than not that no reasonable juror would have convicted him if the jury had been presented with evidence that he had prescriptions for oxycodone during the 15-month period preceding the seizure of over 1,400 pills by law enforcement.

In Donley's affidavit submitted in support of his actual innocence claim, Donley alleges on February 17, 2011, law enforcement "raided" his home and seized 1,680 oxycodone pills and $20,700 cash (Affidavit of Harvey Donley, ECF No. 1 at 40–50). Donley alleges prior to trial, he provided defense counsel with documentation from Doctor's Choice Pharmacy showing that he was prescribed 180 oxycodone pills every 30 days from November 2, 2009 to January 31, 2011, for a total of 3,102 pills (*see id*. and attached pharmacy records). Donley alleges he told counsel that the pills seized by law enforcement were part of his "hoard" or "stockpile" (*id.*). Donley alleges defense counsel advised him that if the quantity of pills seized by law enforcement had been less than 180 (the amount of Donley's **current** prescription at the time of the seizure), then he would have a viable prescription defense (*see id.* at 48), but the fact that law enforcement seized 1,680 pills precluded him from asserting a valid prescription defense (*id.*).

Under Florida law effective at the time of Donley's offense conduct, a person commits the first-degree felony of trafficking in oxycodone when that person is knowingly in actual or constructive possession of 4 grams or more of oxycodone. *See* Fla. Stat. § 893.135(1)(c)1.   As the trial court instructed the jury, to prove the crime of trafficking in oxycodone, the State must prove the following four elements beyond a reasonable doubt:  (1) Donley knowingly sold, purchased, manufactured, delivered or possessed a certain substance; (2) the substance was oxycodone or a mixture containing oxycodone; (3) the quantity of the substance involved was four grams or more; and (4) Donley knew that the substance was oxycodone or a mixture containing oxycodone (*see* Ex. B at 124).

The court also instructed the jury on the definition of possession, both actual and constructive:

> To possess means to have personal charge of or exercise the right of ownership, management or control over the thing possessed. Possession may be actual or constructive.  Actual possessions means, A, the controlled substance is in the hand of or on the person, or, B, the controlled substance is in a container in the hand of or on the person, or, C, the controlled substance is so close as to be within ready reach and is under the control of the person.

> Mere proximity to a controlled substance is not sufficient to establish control over that controlled substance when it is not in a place over which the person has control.  Constructive possession means the

controlled substance is in a place over which Harvey Donley has control or in which Harvey Donley has concealed it.

In order to establish constructive possession of a controlled substance, if the controlled substance is in a place over which Harvey Donley does not have control, the State must prove Harvey Donley's, one, control over the controlled substance, and, two, knowledge that the controlled substance was within Harvey Donley's presence.

Possession may be joint, that is, two or more persons may jointly possess an article exercising control over it. In that case, each of those persons is considered to be in possession of that article.

If a person has exclusive possession of a controlled substance, knowledge of its presence may be inferred or assumed. If a person does not have exclusive possession of a controlled substance, knowledge of its presence may not be inferred or assumed.

(Ex. B at 125–26).

The valid prescription defense, as provided by Florida Statutes § 893.13(6)(a) has been incorporated into Florida Standard Jury Instruction (Crim.) 3.6(n), and provides:

It is a defense to the charge of [possession] [trafficking via possession] for a person to possess a controlled substance which [he] [she] lawfully obtained from a practitioner or pursuant to a valid prescription or order of a practitioner while acting in the course of his or her professional practice.

Fla. Stat. § 893.13(6)(a).

The evidence presented at trial was the following.  Detective George Stinson testified he secured a search warrant for Donley's house, and on February 17, 2011, he and other officers travelled to the vicinity of the house to execute the warrant (*see* Ex. B at 28–30).  Detective Stinson testified the officers conducted surveillance from a position approximately 100–150 yards away from the house for a period of four or five hours (*id.* at 30).  Stinson testified that approximately forty-five minutes prior to executing the warrant, he saw Donley come from a nearby residence to his house carrying what appeared to be socks or rolls of toilet paper under his arm (*id.* at 30–31).  Detective Stinson testified the officers then observed a truck pull up to the residence just after midnight, and they saw the passenger, who they identified as Bobby Betts, exit the truck and enter Donley's home (*id.* at 31–33).  The officers immediately executed the warrant, quickly securing the truck in the front yard (*id.*).  Detective Stinson testified he saw Donley's girlfriend, Miranda Priest, either standing at or opening the front door, but when she saw the officers, she slammed the door shut  (*id.* at 33).  Stinson testified the officers knocked and announced, and then breached the residence (*id.* at 33–34).  The officers secured the only two occupants of the house at the time:  Ms. Priest, who resided there with Donley, and Mr. Betts, who was found in a back room (*id.*).

Detective Stinson testified he observed a scale, a marijuana pipe, and two sandwich baggies containing pills in open view on the dining room table in the house (Ex. B at 35). He testified the corner of one of the baggies was torn and one or two pills were out, "like maybe somebody was fixing to start counting" (*id.*). Photographs of the table, taken in conjunction with Donley's arrest, were admitted into evidence as State's Exhibits 1 and 2 (*id.* at 35–36). Detective Stinson testified that the officers ultimately recovered a total of 1,401 oxycodone pills from the baggies (*id.* at 36–37).

Detective Stinson testified that officers found Donley behind the house, between the house and a shed (App. B at 54). Detective Stinson testified Donley made several post-*Miranda* statements, including, that he knew who Betts was; that he was purchasing the pills from Betts for $13 each; and that he had $18,200.00 hidden in several tube socks to effect that purchase (*id.* at 39–40, 43 (emphasis added)). Detective Stinson testified that he "did the math," and calculated that Donley was intending to purchase 1,400 pills, which was just one less than the 1,401 pills recovered by law enforcement from the house (*id.* at 36–37, 43–44). Detective Stinson testified that Donley also stated he saw the officers "coming up on the cameras and he ran out the back door of the residence" (*id.* at 59). Detective Stinson

testified that Donley also told him that he threw the socks containing the cash under the shed (*id.* at 46). Donley told Stinson that he derived the cash by selling pills for three months (*id.*). Detective Stinson testified that Donley's house had cameras on the outside wall and TV monitors in the common/dining room area where the pills were found. Photographs of the surveillance system were admitted into evidence as State's Exhibits 3–7 (*id.* at 44–45).

Sergeant Ed Cook testified, in material part, that he went around the house to the back in order to secure it while the other officers were executing the warrant and breaching the house (Ex. B at 61–64). Sergeant Cook testified that as he went around the back of the house, he encountered Donley, who was standing behind a shed (*id.* at 63–64). Cook estimated that the shed was eight feet from the back of Donley's house, and that Donley was standing still, next to the shed, when he (Cook) came around the corner (*id.* at 63–67). Sergeant Cook testified there were four rolled-up white socks containing U.S. currency under the shed (*id.* at 62–63). Photographs of the socks and the surrounding area were admitted into evidence as State's Exhibits 8–11 (*id.*).

Samuel Catalani, a crime laboratory analyst with the FDLE, testified that he tested a random sampling of the pills recovered from the scene, and the sample tested

positive for the presence of oxycodone (Ex. at 70–76).  Analyst Catalani testified that his examination of the pills indicated that they were all consistent with the random sampling, with a total weight of 174.3 grams (*id.* at 74–76).

The defense presented testimony from Miranda Priest (Ex. B at 91–98).  She testified she was at Donley's home when law enforcement executed the search warrant (*see id.* at 91–92, 96).  Ms. Priest testified that Donley wasn't home when Bobby Betts arrived or when the officers executed the search warrant (*id.* at 92–93, 96).  On cross-examination, Ms. Priest admitted she spoke to officers at the house within an hour after they entered (*id.* at 99–100).  Ms. Priest denied she told officers the following:  (1) when the officers showed up, Donley and Bobby Betts were sitting down at the dining room table getting ready to count the money and the pills; (2) Donley went out the back door when the officers served the search warrant; and (3) Donley grabbed the money when he ran out the back door (*id.* at 100).

The State called Detective Stinson as a rebuttal witness (Ex. B at 112, 114–15).  Detective Stinson testified that when he and the other officers executed the search warrant, Ms. Priest told them that Donley and Betts were sitting at the table, had opened the bag of pills, and had started counting the pills at the time the officers arrived (*id.* at 114–15).  Detective Stinson testified that Ms. Priest also stated that

Donley grabbed his tube socks with money and ran out the back door when the officers arrived (*id.* at 115).

Considering the evidence presented at Donley's trial, Donley has failed to show that it is more likely than not that any reasonable juror would have had reasonable doubt about his guilt if the jury had been presented with evidence that he had been prescribed a total of 3,102 oxycodone pills from November 2, 2009 to January 31, 2011. Therefore, Donley is not entitled to a federal merits review of his claim through the actual innocence gateway.

## III.    CONCLUSION

Donley's federal habeas petition was not filed within the one-year statutory limitations period; and he has not shown he is entitled to federal review of his petition through any recognized exception to the time bar. Therefore, the State's motion to dismiss should be granted, and the habeas petition dismissed as untimely.

## IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing

required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice

of appeal must still be filed, even if the court issues a certificate of appealability.  28

U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has

made a 'substantial showing of the denial of a constitutional right.'"  *Miller-El v.

Cockrell*, 537 U.S. 322, 336  (2003) (quoting § 2253(c)(2)).  "At the COA stage, the

only question is whether the applicant has shown that 'jurists of reason could

disagree with the district court's resolution of his constitutional claims or that jurists

could conclude the issues presented are adequate to deserve encouragement to

proceed further.'"  *Buck v. Davis*, — U.S.—, 137 S. Ct. 759, 773  (2017) (citing

*Miller-El*, 537 U.S. at 327).   The petitioner here cannot make that showing.

Therefore, the undersigned recommends that the district court deny a certificate of

appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order,

the court may direct the parties to submit arguments on whether a certificate should

issue."  Thus, if there is an objection to this recommendation by either party, that

party may bring this argument to the attention of the district judge in the objections

permitted to this report and recommendation.

Case No.:  4:20cv56/WS/EMT

Accordingly, it is respectfully **RECOMMENDED**:

1.      That Respondent's motion to dismiss (ECF No. 8) be **GRANTED**.

2.      That the petition for writ of habeas corpus (ECF No. 1) be **DISMISSED**

as untimely.

3.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 15<u>th</u> day of October 2020.


                                    /s/ *Elizabeth M. Timothy*
                                    **ELIZABETH M.  TIMOTHY**
                                    **CHIEF UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**